# U.S. BANKRUPTCY COURT
## District of South Carolina

Case Number: 11-04760-dd
Adversary Number: 12-80006-dd

## ORDER DENYING DISCHARGE

The relief set forth on the following pages, for a total of <u>24</u> pages including this page, is
hereby **ORDERED**.

**FILED BY THE COURT**
**08/02/2012**



David R. Duncan
US Bankruptcy Judge
District of South Carolina

Entered: 08/03/2012

Entered: 08/03/2012

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re: | |
| Robert Joseph Ward, | Case No. 11-04760-dd |
| Debtor. | Chapter 7 |
| W. Clarkson McDow, Jr., United States Trustee for Region Four, | Adv. P. No. 12-80006-dd |
| Plaintiff. | |
| v. | |
| Robert Joseph Ward, | |
| Defendant. | |

### ORDER DENYING DISCHARGE

This adversary proceeding comes before the Court on the Complaint of the United States

Trustee ("UST") pursuant to 11 U.S.C. § 727 seeking to deny the debtor's discharge.[1]  Jurisdiction

for this proceeding is premised upon 28 U.S.C. §§ 1334(a, b), 157(a).  This adversary proceeding

is a core proceeding.  28 U.S.C. § 157(b)(2)(J).

This proceeding arises under Title 11 U.S.C. and arises in and relates to the chapter 7

bankruptcy case of *In re Robert Joseph Ward,* case no. 11-04760-dd, pending before the Court.

Venue of this proceeding appropriately exists in this district.  28 U.S.C. § 1409(a).   The UST has

the authority to bring this action pursuant to his statutory authority as set forth at 28 U.S.C. § 586.

---

[1] Further reference to Title 11 U.S.C. § 101, *et seq.* will be by section number only.

1

The UST filed the Complaint on January 5, 2012, to which the debtor filed an answer.   A trial was held on July 17, 2012.   Based on the pleadings of counsel and the evidence submitted to the Court, the Court makes the following findings of fact and conclusions of law:

<u>Findings of Fact</u>

1.      W. Clarkson McDow is the United States Trustee for Region Four and the plaintiff in this adversary proceeding (the plaintiff).

2.      Robert Joseph Ward is domiciled in the State of South Carolina.  Mr. Ward is the debtor in a chapter 7 bankruptcy case pending before this Court, case no. 11-04760-dd.

3.      The UST has filed this complaint within the time for the UST to object to the debtor's discharge.

4.      The debtor filed a voluntary petition for relief pursuant to chapter 7 on July 29, 2011, initiating the present bankruptcy case.

5.      The debtor filed schedules and statements in his case under penalty of perjury on September 3, 2011.

6.      The debtor testified at a first meeting of creditors on September 14, 2011 and October 12, 2011.  The debtor testified at an examination pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (FRBP) on November 3, 2011 and January 4, 2012.  The debtor also testified at a deposition on May 8, 2012.  Transcripts of the testimony at the meetings of creditors were submitted into evidence as Exhibits CC and DD, respectively.  Transcripts of the Rule 2004 examinations were submitted into evidence as Exhibits EE and FF.  A transcript of the deposition was submitted into evidence as Exhibit GG.

7.      The parties stipulated to the admission of Exhibits A through GG into evidence.

2

The UST called Robert Doyle, a paralegal specialist with the UST, as a witness.  The debtor testified as well.

8.    Through Mr. Doyle's testimony, the UST established that the debtor had transferred $125,000 from a joint bank account to a bank account in his wife's name only on December 11, 2009.[2]  The wife's bank account is with Carolina Trust Federal Credit Union ("Carolina Trust") and statements for this account were admitted into evidence as Exhibit A.  The $125,000 resulted from the sale of stock that was solely in the debtor's name, and that sale occurred on September 22, 2009.[3]  All deposits since the establishment of the Carolina Trust account were also funded by the debtor.[4]  The debtor testified he had access to this account and paid bills from it.[5]

9.    At his Rule 2004 examination on November 3, 2011, the debtor testified that he transferred the $125,000 to a bank account in his wife's name only because ". . . I didn't know if I was going to be sued or if anybody was going to take that money."[6]  The debtor testified that he knew he was in financial trouble and was going to file bankruptcy in October or November of 2009.[7]

---

[2]  Page 1 of Exhibit A reflects that account is solely in Carol Ward's name.  There are three deposit accounts associated with the credit member account, a regular share account, a free checking account and a money market account.  Page 5 of Exhibit A reflects a deposit of $125,000 on December 11, 2009.

[3]  Exhibit I reflects that the debtor exercised his rights to sell stock on September 22, 2009.  Page 108 of Exhibit C, the bank statements for the Truliant Federal Credit Union bank account, reflect a deposit of $131,129.90 on September 25, 2009.  The debtor also testified at the first meeting of creditors on September 14, 2011 that the money in the Carolina Trust account came from the sale of the stock.  *See* Exhibit CC, p. 13, lines 4-6.

[4]  Exhibit EE, p. 39, lines 13-16.

[5]  Exhibit EE, pp. 33 - 34, lines 17 -25 and lines 1- 10.

[6]  Exhibit EE, p.36, lines 11-13.

[7]  Exhibit EE, p. 10, lines 17 - 25.

10.     On November 2, 2010, $75,000 was transferred from the Carolina Trust account

to a bank account solely in the name of the debtor's daughter, Rebecca Ward.[8]  Of the $75,000,

$25,000 was returned to the Carolina Trust account on June 16, 2011[9], and $25,000 was transferred

to an e-trade account in the debtor's daughter's name only.[10]  The debtor testified that he handled

the transfers from the daughter's bank account to the daughter's e-trade account.[11]  The debtor also

testified that he had access to the daughter's bank account and the daughter's e-trade account.[12]

11.     The debtor had provided inconsistent testimony regarding why the $25,000 was

returned to the Carolina Trust account;[13] however, it is clear that the debtor could control the return

of money from his daughter's account and did so.  In addition to the $25,000 returned and used to

pay bills of the debtor and his wife, the debtor testified that an additional $15,000 was taken from

his daughter's account to pay bills sometime in 2012.[14]  The $15,000 was paid directly to credit card

companies and applied to debts incurred in his wife's name only.  Thus, $40,000 of the $75,000

---

[8]  Exhibit A, at page 4, shows a withdrawal of $75,000.  Exhibit O, at page 268, shows a deposit into the daughter's bank account on November 2, 2010 in the amount of $75,000.

[9]  The debtor's Chapter 7 Statement of Current Monthly Income and Means-Test Calculation does not reflect the $25,000 deposited into the Carolina Trust account on June 16, 2011, which was within the six months preceding the bankruptcy case.  Exhibit B, pp. 54 - 57.

[10]  Exhibit O, at page 250, reflects $25,005 withdrawn on June 16, 2011.  Exhibit A, at page 2, reflects a deposit of $25,000 on June 16, 2011.  Exhibit M also reflects the return of $25,000 from the daughter's bank account to the Carolina Trust account.  Exhibit N shows the e-trade account in the daughter's name.

[11]  Exhibit GG, pp. 21 - 22, lines 24-25 and lines 1-5.

[12]  Exhibit FF, p. 43, lines 5 - 20.  Exhibit GG, pp. 21 - 22, lines 24-25 and lines 1-5.

[13]  Exhibit EE, p.79, lines 1-15.  Exhibit FF, pp. 26-27, lines 21-25 and lines 1-15.

[14]  Exhibit GG, pp. 22-23.

4

transferred to the daughter's bank account was returned to the debtor and his wife and used for their personal expenses.

12.     On the date of the debtor's bankruptcy case, the daughter's bank account had a balance of approximately $25,400,[15] and the e-trade account had a balance between $26,046.03 and $24,109.89.[16]  On July 31, 2011, the Carolina Trust account had a balance of $5,025.76 in the money market account[17] and $3,439.66 in the free checking account.[18]  Schedule B of the debtor's bankruptcy schedules filed on September 3, 2011 only reflects a saving account with Truliant Federal Credit Union containing $2,000.[19]  Approximately $58,465.42 was available in accounts under the debtor's control on the petition date but was not disclosed in the debtor's bankruptcy schedules and statements.

13. The debtor disclosed the Carolina Trust account at the first meeting of creditors only after questioning by the UST on how the debtor could afford to pay his bills with an income of $888 per month and a rent expense of $2,000.[20]  The debtor did not volunteer the information or disclose it in response to prior questions, even when he was asked if his wife had an ownership interest in anything in which he did not indicate he had an ownership interest.  The debtor responded "no", even though the Carolina Trust account was in his wife's name only and was not mentioned in the

---

[15]  Exhibit O, page 247.

[16]  Exhibit N, page 222.

[17]  Exhibit A, page 2.

[18]  Exhibit A, page 7.

[19]  Exhibit B, page 23.

[20]  Exhibit CC, p. 13, lines 2 - 8.

bankruptcy schedules.[21]  The debtor also had not provided the chapter 7 trustee with copies of the

Carolina Trust bank statements.[22]

14.     At the Rule 2004 examination on November 3, 2011, the debtor tried to re-

characterize the money in the Carolina Trust account and his daughter's accounts as money

belonging to his wife and daughter.  The debtor claimed the majority of the money deposited in the

Carolina Trust account was from his wife from her years of working and inheritance,[23] and that the

$75,000 deposited into his daughter's account was from gifts from grandparents and money his wife

had saved for their daughter's education.[24]  Ultimately, to reconcile his testimony regarding the

source of the $125,000 deposited into the Carolina Trust account, the debtor admitted that the funds

came from the sale of stock that was solely in his name, but stated he owed the money to his wife

and daughter and so he considered it theirs.[25]

15.     Question 10 on the statement of financial affairs requires the disclosure of all

property transferred in the two years before the commencement of the bankruptcy case.  Two years

before the commencement of the debtor's case was July 29, 2009.  The sale of stock on September

22, 2009 is not listed.  The transfer of the $125,000 to an account in his wife's name only on

December 11, 2009 is not listed.  The $75,000 transfer to his daughter's account on November 2,

---

[21]  Exhibit CC, pp. 5-6, lines 25 and lines 1 -3.

[22]  Exhibit CC, p. 22, lines 17 - 24.

[23]  Exhibit EE, pp. 35-36, lines 20 - 25 and lines 1-7.

[24]  Exhibit EE, pp. 76-77, lines 22 - 25 and lines 1-2.

[25]  Exhibit FF, p. 33, lines 13 -19.  Exhibit GG, p. 38, lines 12-20.

2010 is not listed.  The only transfer listed is the sale of a 2002 Toyota Land Cruiser.[26]  The 2002

Toyota was titled in the debtor's name,[27] but the cashier's check was made payable to his wife

only.[28]  The funds were deposited into the Truliant bank account disclosed on Schedule B and not

into the Carolina Trust account.

16.    The Carolina Trust bank statements also reflect that the debtor was making

significant payments on credit cards which were solely in his wife's name.[29]  Within 90 days of the

bankruptcy petition, $18,021.98 was paid to credit card companies.  Within one year, $47,242.33

was paid to credit card companies.  The debtor testified he was making these payments from the

Carolina Trust account because he wanted to get his wife out of debt before he ran out of money so

she would have good credit.[30]  The debtor's bankruptcy schedules and statements do not reflect the

payments made to the credit card companies.

17.    The debtor's schedules and statements are void of any references to the sale of the

stock, the Carolina Trust account and all transfers which have occurred therefrom, the daughter's

bank account and e-trade account, and the debtor's access and use of those accounts.  While not

argued at trial, the UST noted in the presentation of its case that the debtor has previously testified

that he disclosed the sale of stock in responding to question 1 of the Statement of Financial Affairs.

---

[26] Exhibit B, page 44.

[27] Exhibit FF, pp. 36-37, line 25 and lines 1-3.

[28] Exhibits K and L.

[29] Exhibit A, pages 6 - 19.  Exhibits Q, R, S and T are credit card statements reflecting that
the credit cards were in the debtor's wife's name only.

[30] Exhibit EE, p. 53, lines 10 -16.  Exhibit FF, p. 19, lines 6 - 9.  Exhibit FF, p. 44, lines 6-
20.

For 2009, the debtor listed joint wages of $471,357.[31]  Nothing in that response indicates that it included revenue from the sale of stock.  The UST noted that the debtor's 2009 tax return reflected the sale of the stock in addition to showing the debtor's wages as $471,357.[32]  The debtor did not undertake to make such a disclosure in his bankruptcy schedules and statements.  There is nothing in the debtor's bankruptcy schedules and statements to provide reasonable notice of the sale of the stock.  Additionally, the debtor did not disclose the sale of stock when asked by the chapter 7 trustee at the first meeting of creditors if he had "sold, given away, mortgaged, or otherwise disposed of any substantial asset, worth $5,000 or more, in the last six years?"[33]  The debtor did not disclose the sale of stock until compelled to do so following further questioning at the first meeting of creditors on September 14, 2011.

18.    The debtor owns two condominiums at Myrtle Beach, South Carolina, unit 1427 and unit 1602.[34]  In response to question 1 of the Statement of Financial Affairs, the debtor shows rental income of $67,694 for 2010 but does not reflect any rental income for 2011.[35]  Schedule G does not reflect any contracts or leases.[36]  Schedule I does not reflect any income from the rental of real properties.[37]

---

[31]  Exhibit B, page 41.

[32]  Exhibit X, page 349.

[33]  Exhibit CC, p. 3, lines 4-12.

[34]  Exhibit B, page 22.

[35]  Exhibit B, page 41.

[36]  Exhibit B, page 36.

[37]  Exhibit B, page 38.

19.        The UST offered into evidence monthly statements issued by the management companies reflecting revenues from unit 1602 and unit 1427, which are exhibits G and H.[38]  The July 2011 monthly statement for unit 1602 showed total revenue year to date as $24,181.02.[39]  The January through July 2011 statements for unit 1427 indicate total revenues of $17,109.42.[40]  Therefore, the total rental income at the time of the bankruptcy filing for 2011 was $41,290.44 rather than "none" as reflected in question 1 of the Statement of Financial Affairs.

20.        The July 2011 statement for unit 1602 shows that the debtor received a check for $4,558.12.[41]  The debtor testified that he did receive that check but did not know he was not allowed to keep it.[42]  It appears this check was deposited with other funds on August 17, 2011 into the Carolina Trust account.[43]  August 17th was approximately two weeks before the debtor filed his bankruptcy schedules and statements and a month before his first meeting of creditors.

21.        The June 2011 statement for unit 1427 indicates the debtor received a check for

---

[38]  The UST also admitted into evidence the debtor's 2010 tax return as Exhibit F that had the same total revenue for unit 1602 as was reflected in the December 2010 monthly statement for year to date.  Exhibit F, page 145 and Exhibit G, page 178.  The debtor's 2010 tax return also showed homeowner fees in the amount of $11,892 for unit 1602 and $6,801 for unit 1427.  Exhibit F, pages 158 and 157.

[39]  Exhibit G, page 185.

[40]  Exhibit H, pages 189 - 201.

[41]  Exhibit G, page 185.

[42]  Exhibit FF, p. 16, lines 21-25.

[43]  Exhibit A, p. 16.

9

$1,289.38.[44]   The debtor deposited $1,289.38 on July 22, 2011 into his Truliant bank account.[45]

July 22nd was one week before the debtor filed his bankruptcy case.

22.    The debtor did not disclose the rental income until asked several questions

regarding it at the first meeting of creditors.  When asked about the last time he rented either of the

condos, the debtor responded that he did not rent them personally; instead, he indicated that they

were on a rental program.  Then, when asked about the last time he received income from the rental

program, the debtor responded that it would be hard to say, because he had not been paying

homeowner association fees.  Finally, after being asked if he had received any rent in 2011, the

debtor acknowledged a $4,000 check for unit 1602, but testified he had not received anything for

unit 1427.[46]  Only with persistent questioning did the debtor disclose any of the rental income.[47]

23.    Exhibits G and H show that checks for rental income continued for August,

September, and October.  Checks for unit 1602 were issued in the amount of $3,148.10 for August,

$1,608.70 for September, and $1,139.31 for October.[48]  Checks for unit 1427 were issued in the

amount of $1,175.60 for August, $911.77 for September, and $999.95 for October.[49]

24.    At the first meeting of creditors, in addition to the deficiencies regarding the

---

[44] Exhibit H, pages 198 - 199.

[45] Exhibit C, page 61.

[46] Exhibit CC, pp. 9-10, lines 6-25 and lines 1-5.

[47] Following this questioning, the chapter 7 trustee directed the debtor to turn over rent
checks to him and to account for the rent check he had received.  Exhibit CC, p. 23, lines 9 - 11.
Exhibit CC, p. 26, lines 15 -16.

[48] Exhibit G, pages 186-188.

[49] Exhibit H, pages 202 -207.

disclosure of the Carolina Trust bank account, the sale of the stock, and the rental income, the

chapter 7 trustee and the UST noted that the debtor also failed to disclose the sale of furniture for

$10,000 and include a leased car payment for the debtor's wife on Schedule J.[50]  The debtor only

disclosed the sale of the furniture after the chapter 7 trustee specifically asked the debtor what

happened to the furniture the debtor had in a house in Maryland when he moved.[51]  The debtor then

disclosed the house sale in October 2009 from which he received approximately $10,000.  The

leased car of the debtor's wife and the absence of that expense on Schedule J were only disclosed

after the debtor was specifically asked if his wife owned a car that was different than the one he

drove.[52]  The debtor had several opportunities to disclose this information, but only disclosed it when

asked specific questions which compelled a response.[53]

25.The deficient disclosures noted at the September 14, 2011 first meeting of creditors were

not cured until February 29, 2012, almost six months later.[54]

26.    The parties filed stipulations of fact[55] in which the debtor admitted the errors and

omissions in his schedules and statements as reflected by changes in his amended schedules and

---

[50]  Exhibit CC, pp. 6 -8, lines 15-25, lines 1-25, and lines 1-9.

[51]  *Id.*

[52]  Exhibit CC, p. 18, lines 4-22.  Exhibit CC, pp. 19-20, lines 18-25 and lines 1-9.

[53]  Exhibit CC, pp. 5-6, lines 21-25 and lines 1-3.

[54]  The debtor amended the schedules on September 14, 2011, but only added creditors at that time.

[55]  The debtor has stipulated to most of the facts discussed above.  *See* stipulated facts 12 through 36.  The stipulated facts are part of the record and the Court has relied on the stipulated facts in reaching its conclusions, even if the stipulated fact is not specifically referenced herein.

11

statements.[56]

27.    A comparison of the original schedules and statements against the amended

schedules and statements reflects that the debtor only made changes to items which were discussed

and did not undertake an independent review to identify and  correct any other errors and omissions.

---

[56] Stipulated Fact No. 30(a) - (l) of the Joint Stipulation filed by the parties on June 6, 2012, docket number 9.  Stipulated Fact No. 30 provides as follows:  The debtor has admitted there were errors and omissions in his original schedules and statements by filing his amended schedules and statements which changed the following information:

a.    Schedule A reflects joint ownership with his wife in two condominiums.
b.    Schedule B reflects all bank accounts in the household, whether owned jointly or solely by debtor or debtor's wife.
c.    Schedule B reflects debtor's one-half interest in a security deposit regarding a former rental apartment.
d.    Schedule B reflects that the debtor was "not aware that he would be entitled to any receivables regarding the two rental condominiums since he has not been paying the mortgages.  Debtor believed all rental income to be owned by the mortgage companies."
e.    Schedule B reflects the exact balance of the T. Rowe Price account as of July 1, 2011, which was $122,005.
f.    Schedule G reflects two executory contracts regarding rental agents for the two condominiums.
g.    Schedule I shows the debtor's unemployment and notes the unexpected rental income received after the filing of the petition.
h.    Schedule J reflects the spouse's car payment.
i.    SOFA shows no income for 2011 under number 1 regarding wages or business income, however, SOFA number 2 reflects income for 2011 as of the date of filing which added $15,684 for 2011 federal tax refund, $1,625 for state tax refund and $25,000 from daughter's repayment of college funds.
j.    SOFA number 1 still includes the income figure for 2009 but clarifies that it includes stock option sale.
k.    SOFA number 3 reflects all payments to the spouse's credit card companies within 90 days prior to the filing the petition.
l.    SOFA number 10 reflects the sale of stock in 2009, the sale of furniture in 2009 and transfers to insiders to include a transfer of $125,000 to Carol Ward on September 25, 2009 (in which the debtor retained a ½ equitable interest) and a transfer of $75,000 to Rebecca Ward in November 2011.

At trial, the UST demonstrated that Schedule A had not reflected how the real property was titled, as required by the schedule.  In the amended schedules, the debtor only corrected how title was held for the condominiums and did not correct how title was held in the residence in Maryland.  The debtor added a security deposit for $1,300 on Schedule B,[57] but the UST indicated that a deposit of $1,300 was made in the Carolina Trust account on June 6, 2011, which may make the added security deposit incorrect because the deposit was refunded pre-petition.[58]  The debtor obtained a real estate license in June 2011[59] and has received income post-petition from real estate sales,[60] but the debtor never disclosed this information on Schedule I because it was never specifically noted as a deficiency.[61]

28.    The debtor's prior testimony also indicates a lack of concern regarding the accuracy of his schedules and statements.  The ownership of the condominiums was discussed at the Rule 2004 examination on November 3, 2011.[62]  The debtor's counsel at that time was Robert Cooper.  The amended schedules were filed by the debtor's current counsel, Marie Cooper.  However, the debtor has testified that he did not have any discussions with Marie Cooper regarding

---

[57]  At the Rule 2004 examination on November 3, 2011, the debtor testified that a $1,300 deposit may have been included in the $7,627.38 deposit on August 17, 2011.  The UST noted that schedule B did not reflect a security deposit.  Exhibit EE, pp. 42-43.

[58]  Exhibit A, page 10.

[59]  Exhibit EE, pp. 7, 9 and 10.

[60]  Exhibit GG, pp. 78-79.

[61]  The debtor had an opportunity to disclose his anticipated income as a realtor at the first meeting of creditors, but he did not do so.  Exhibit CC, p. 19, lines 2 - 17.

[62]  Exhibit EE, pp. 80 - 81.

13

the issue of ownership of the condominiums[63] because:

> But to me, that doesn't matter, if it's joint or individual.  Either way
> I lost both of them.  To me, they're going to take care of it.  They're
> going to send me whatever documentation I have to, to sign off on it.
> So what would it matter to you?  If you lost both of these pieces of
> property, what does it matter if they are joint or individual?  They're
> gone.
>
> * * * *
>
> But if anybody asked me for any information for that documentation,
> to prove whether it is, and how to get it fixed, so I can help you guys,
> I would have done that.  I didn't go back, to be honest with you.  I
> didn't really feel that that was my position to do that.  I pay these
> attorneys.[64]

29.    The debtor's disregard concerning the accuracy of the information in his

bankruptcy schedules and statements was also demonstrated by the value attributed to the T. Rowe

Price IRA listed on Schedule B.   The debtor listed the value at $90,000.   However, quarterly

statements issued by T. Rowe Price and admitted into evidence as Exhibit J indicate that the value

was between $122,005 and $103,637.24.[65]   The debtor testified that he just gave the number he

thought was correct.[66]  Even though the statements were readily available to him, he did not look at

anything when completing his bankruptcy schedules and statements.[67]

30.    At trial, the debtor testified that he never reviewed his original schedules and

statements, but merely flipped through them.  The debtor also testified that he had never reviewed

---

[63]  Exhibit GG, p. 72, lines 6 -11.

[64]  Exhibit GG, pp. 72-73, lines 24-25 and lines 1-16.

[65]  Exhibit J, pages 211 - 213.

[66]  Exhibit EE, pp. 48 -50, lines 11-25, lines 1-25, and lines 1-20.

[67]  Exhibit GG, pp. 17 - 18 and pp. 53-54.

or signed the amended schedules and statements filed on February 29, 2012.  In his prior testimony, the debtor has admitted to a failure to review his schedules and statements and to ask questions of his counsel.[68]  Despite his failure to review the schedules and statements, when the chapter 7 trustee asked the debtor if he had thoroughly reviewed his schedules and statements, the debtor said yes.[69] The debtor subsequently testified, regarding his earlier testimony concerning the thoroughness of his document review, that ". . . if I knew there was going to be this many follow-up questions, I probably would have said no, I hadn't; I need to stop everything."[70]  The debtor previously testified he thought everybody would just pull up his social security number and see what he owned and what he was going to discharge.[71]  The debtor's actions and testimony indicate that the debtor intended to rely on others and took little personal responsibility for the accuracy of the information in his schedules and statements.

## **Conclusions of Law**

The UST filed his complaint seeking a denial of the debtor's discharge under §§ 727(a)(2)(A, B) and 727(a)(4)(A).  Those sections state, in relevant part:

> (a) The court shall grant the debtor a discharge, unless –
> . . .
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–

---

[68]  Exhibit EE, p. 55, lines 22 - 25.  Exhibit GG, pp. 57 -59, lines 4-25, lines 1-25 and lines 1-2.

[69]  Exhibit CC, p. 2, lines 20 -23.

[70]  Exhibit GG, p.58, lines 17-19.

[71]  *Id.*, lines 20 -24.

(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition;
. . .
(4) the debtor knowingly and fraudulently, in or in connection with the case –
(A) made a false oath or account.

Section 727(a)(2)(A) requires that the plaintiff show by a preponderance of the evidence that:

(1)     the act under scrutiny occurred during the one-year period before the bankruptcy[72];

(2)     the act was done with actual intent to hinder, delay or defraud creditors or the trustee;

(3)     the debtor or his duly authorized agent was the actor; and

(4)     the act in question consisted of either the transferring, removing, destroying or concealing of the debtor's property.

*Adams v. Filter*, No. 99-04462-jw, Adv. No. 99-80370-jw, 2000 Bankr. LEXIS 1922, at *13 (Bankr. D.S.C. June 16, 2000).  The intention to fraudulently conceal assets may be based on circumstantial evidence or upon inference drawn from a course of conduct.  *In re Parker*, 85 B.R. 384, 387 (Bankr. E.D. Va. 1988) (citing *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751 (9th Cir. 1985); *Bank of Penn. v. Adlman (In re Adlman)*, 541 F.2d 999, 1003 (2d Cir. 1976)).  Courts may look to the badges of fraud in inferring fraudulent intent.  The badges of fraud include: (1) the relationship between the debtor and transferee; (2) the consideration for the transfer; (3) the debtor's insolvency or indebtedness; (4) the transfer of the debtor's entire estate; (5) a reservation of benefit, control or dominion by the debtor; (6) the secrecy or concealment of the transaction; and (7) the pendency or threat of litigation at the time of the transfer.  *In re Lafferty*, 469 B.R. 235, 248 (Bankr. D.S.C. 2012) (citing *In re Jones*, 397 B.R. 765, 770 (Bankr.D.S.C. 2008)); *Hovis v. Ducate (In re*

---

[72]  § 727(a)(2)(B) covers transfers and concealment of property of the estate after the date of the filing of the petition.

*Ducate*), 369 B.R. 251, 261 (Bankr. D.S.C. 2007) (citing *Coleman v. Daniel*, 261 S.C. 198, 199 S.E.2d 74 (1973)).

In this case, the debtor transferred a substantial asset to his wife for no consideration at a time when he knew he was in financial trouble and likely to file bankruptcy. The debtor has testified that his intention in transferring the $125,000 to an account in his wife's name only was to protect it because he ". . . didn't know if [he] was going to be sued or if anybody was going to take that money."[73] A review of the debtor's bankruptcy schedules indicates that the $125,000 was the debtor's only significant asset that was not encumbered by liens. After the transfer of the money to his wife's bank account, the debtor continued to use the funds to pay bills and to pay down debts of his wife. The facts in this case clearly support that the debtor had a fraudulent intent when he made the transfer of the $125,000 on December 11, 2009.

While the initial transfer of the $125,000 occurred more than one year before the bankruptcy case, the debtor's concealment of the asset has continued into the year before the bankruptcy filing, as well as after the bankruptcy filing. The debtor did not disclose the Carolina Trust account or any transfers from it in his bankruptcy schedules and statements. Even after disclosing the Carolina Trust account,[74] the debtor attempted to portray the funds in the Carolina Trust account and his daughter's accounts as his wife and daughter's money. Rather than turning the funds in the Carolina Trust account and his daughter's accounts over to the chapter 7 trustee, the debtor has depleted another $15,000 from his daughter's account to pay personal expenses post-petition. The continuous

---

[73] Exhibit EE, p. 36, lines 11-13.

[74] The debtor has never disclosed his interest in his daughter's account in his bankruptcy schedules and statements. The amended schedules and statements only disclose the $75,000 transfer to the daughter, but does not reflect the debtor's use and control of those transferred funds.

17

concealment doctrine allows a concealed asset to be within the reach of § 727(a)(2), regardless of when the transfer occurred and the concealment initially took place, if the concealment continues, with the requisite intent, into the time period covered by § 727(a)(2). *Anderson v. Hooper*, 274 B.R. 210 (Bankr. D.S.C. 2001).  The UST has met his burden in showing that there was a continuous concealment of this asset, bringing it within the parameters of § 727(a)(2).

The UST has shown by a preponderance of the evidence that the debtor transferred $125,000 on December 11, 2009 with the intent to hinder, delay or defraud a creditor, and that the concealment of the transfer has continued to the time of the bankruptcy filing and after the bankruptcy filing.  It is clear the $125,000 was property of the debtor which resulted from the sale of stock which was solely in his name.  The debtor has previously testified that any deposits made after the $125,000 was transferred to the Carolina Trust account were also from him.  The funds in the Carolina Trust became property of the estate upon the filing of the bankruptcy petition.  The fact that the debtor's name did not appear on the Carolina Trust account did not alter the fact that the property deposited into the account were the debtor's funds – he maintained control and access of the funds, and he used the funds.  As such, the UST has met his burden in showing the debtor should be denied a discharge under §§ 727(a)(2)(A and B).

Similarly, the funds deposited into his daughter's bank account and e-trade account were transferred with the intent to hinder and delay a creditor or an officer of the estate.  The $75,000 transferred from the Carolina Trust account on November 2, 2010 were traced to the proceeds from the sale of stock solely in the debtor's name.  The debtor continued to maintain control and use of the funds after the transfer.  The debtor did not disclose the funds in his bankruptcy schedules and statements and provided misleading testimony in an effort to shield the funds from the chapter 7

18

trustee.[75]  The debtor also has removed $15,000 of the funds from the estate by allowing its use to

pay credit cards solely in his wife's name.[76]  This action was taken after the debtor was aware that

the chapter 7 trustee had claimed an interest in the $75,000.[77]  At the time of the transfer of the

$75,000, and at the time of the use of the $15,000 post-petition, the debtor was insolvent.  His

Schedule I reflected total monthly income of $888 from unemployment benefits while he had a

monthly rent expense of $2,000.  The debtor had not been paying on his mortgages, and his

Summary of Assets and Liabilities indicates that he had total debt of $1,694,460 and total assets of

$1,322,970.[78]  The UST has met his burden in showing the debtor should be denied a discharge

under §§ 727(a)(2)(A and B).

The debtor has two condominiums disclosed on Schedule A.  However, the bankruptcy

schedules filed on September 3, 2011 indicate the debtor had no rental income from the two

condominiums in 2011; there is no management agreement or rental agreements regarding the

condominiums listed; and Schedule I reflects that the debtor does not expect any rental income.  The

debtor did not voluntarily disclose that he had received at least two rental checks prior to the first

meeting of creditors, and prior to the filing of his bankruptcy schedules and statements.  His

testimony at the first meeting of creditors when specifically asked about the rental income was

---

[75]  As discussed in the findings of fact, the debtor testified that the $75,000 was from gifts from grandparents and money saved by his wife for their daughter's education.  Clearly, the $75,000 came from the sale of the debtor's stock.

[76]  While this specific allegation was not contained in the complaint, it occurred after the complaint was filed and the parties included these factual allegations in their stipulated facts. Stipulated Fact No. 24.

[77]  *Id.*

[78]  Exhibit B, page 20.

19

evasive.  There is nothing to suggest, had the UST not persisted in questioning the debtor, that the

debtor would have disclosed his receipt of rental income.  "Bankruptcy is not a game of hide and

seek that Debtor plays with the Trustee and the Court.  Full disclosure is the *quid pro quo* for a

debtor's discharge."  *Anderson v. Walker*, No. 99-09899-jw, Adv. No. 00-80086-jw, 2001 Bankr.

LEXIS 1849, at *12 (Bankr. D.S.C. Jan. 5, 2001).  The debtor has acknowledged his receipt and use

of a post-petition rental check in the amount of $4,558.12, but asserts he did not know he could not

keep it.  The debtor's failure to be forthcoming regarding his receipt and deposit of the check, and

his responses to questions directly related to the rental income belie his asserted lack of intent to

conceal and/or remove the rent check from the estate.  The UST has met his burden in showing the

debtor should be denied a discharge under § 727(a)(2)(B).

  The UST has also sought the denial of the debtor's discharge under § 727(a)(4)(A).  To

prevail under § 727(a)(4)(A), the UST must demonstrate by the preponderance of the evidence that

the debtor made a statement under oath that he knew to be false and that the debtor made the

statement willfully with the intent to defraud.  *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d

249, 251 (4th Cir. 1987). The false oath must also relate to a material matter.  *Id.; Aiken-Augusta*

*Auto Body, Inc. v. Groomes*, , No. 01-03492-jw, Adv. No. 01-80148-jw, 2002 Bankr. LEXIS 1858,

at *9 (Bankr. D.S.C. Feb. 5, 2002).  The question of whether the debtor has made a false oath under

section 727(a)(4)(A) is a question of fact.  *Williamson*, 828 F.2d at 251.

  The UST has asserted that the debtor made false oaths by failing to disclose the Carolina

Trust account, the transfers from the Carolina Trust account, the sale of the stock, the rental income

from the condominiums, the current value of the IRA, the sale of furniture, the debtor's anticipated

income as a realtor, and lease payments for the vehicle of the debtor's wife on Schedule J.  The UST

20

has also asserted that the debtor has made false oaths in sworn testimony regarding many of the same items.

As an initial matter, it is clear that the information regarding the debtor's interest in bank accounts, his transfer or sale of assets, and his income and expenses are material matters. A matter is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Williamson*, 828 F.2d at 252 (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)). As discussed previously, the debtor's conduct clearly indicates a fraudulent intent in failing to disclose the sale of stock, the debtor's interest in the Carolina Trust account, the transfers from the Carolina Trust account, and the rental income from the properties.

Fraudulent intent can also be satisfied by a reckless indifference or a pattern of cavalier disregard for the truth. *McDow v. Geddings*, No. 05-02050-jw, Adv. No. 05-80183-jw, 2006 Bankr. LEXIS 161, at *13-14 (Bankr. D.S.C. Jan. 27, 2006) (citing *Anderson v. Hooper*, 274 B.R. 210 (Bankr. D.S.C. 2001); *McDow v. Rothschild*, No. 03-11346-jw, Adv. No. 03-80563-jw, 2004 Bankr. LEXIS 2422, at *17-18 (Bankr. D.S.C. July 1, 2004)). In this case, the debtor's reckless indifference is not only demonstrated by the number of errors in the schedules and statements, but also in his failure to answer honestly in sworn testimony. The debtor has provided inconsistent testimony on: (1) the source of the funds in the Carolina Trust account and his daughter's accounts; (2) the use of the $25,000 returned to the Carolina Trust account on June 16, 2011; (3) the thoroughness in which he reviewed his schedules and statements; (4) his disclosure of his future income; and (5) whether he discussed various items with his counsel regarding what should be disclosed in his schedules and statements. The debtor has admitted on several occasions that he did not review his schedules and

21

statements in any detail but relied on counsel.  The debtor has previously testified that he did not

review any documents in providing information for the schedules and statements but merely stated

what he thought was correct.  Such conduct clearly reflects a fraudulent intent.

The debtor does not dispute the errors and omissions asserted by the UST.  Rather, the

debtor's only argument at trial is that his counsel was to blame.  The debtor's initial bankruptcy

counsel ("Original Counsel") was suspended from the practice of law for a period of time and her

husband was substituted as counsel for the debtor ("Substitute Counsel").  During the representation

of Substitute Counsel, the debtor filed his schedules and statements, attended the two meetings of

creditors, and attended the first Rule 2004 examination.  Original Counsel appeared with the debtor

at the second Rule 2004 examination and the deposition and filed the amended schedules and

statements.  The debtor testified that he believed he had inadequate representation with Substitute

Counsel and that Original Counsel had requested little documentation.  The debtor did not present

any evidence regarding how the asserted inadequate representation was the cause of the errors and

omissions discussed.

The only evidence before the Court is that the debtor did not review his schedules and

statements in any detail, did not ask questions of his counsel, did not provide full and truthful

testimony at his first meeting of creditors, and took no action to correct the situation.  A debtor

cannot neglect his duties of being honest and taking seriously the obligation to disclose all matters.

"Accordingly Debtors have a duty to respond to the questions asked of them thoroughly and

thoughtfully."  *Aiken-Augusta Auto Body, Inc. v. Groomes*, No. 01-03492-jw, Adv. No. 01-80148-

jw, 2002 Bankr. LEXIS 1858, at 9 (Bankr. D.S.C. Feb. 5, 2002).  Here, the debtor failed to present

any evidence that he met these obligations, and the resulting errors were therefore the result of

counsel.[79]  When asked at the first meeting of creditors if he had "sold, given away, mortgaged, or otherwise disposed of any substantial asset, worth $5,000 or more, in the last six years", the debtor chose not to disclose the sale of stock, the transfer of the $125,000, or the sale of furniture.  The question was easily understood and the debtor provided a false response.

The debtor testified at trial that he had been up front and honest throughout the process.  The debtor testified that he believed the issues raised by the UST in his complaint were due to actions of his counsel and that he could not afford to hire new counsel.  The facts presented at trial do not support the debtor's assertions.  The debtor's schedules and statements omitted material information regarding his assets and financial affairs.  The debtor did not voluntarily provide testimony on the omitted assets, but rather had to be asked various questions until the information *had* to be disclosed.  Had the debtor asked his counsel questions, had he reviewed his schedules and statements, and had he been honest in his testimony to the chapter 7 trustee, he may well have avoided the action taken against him by the UST.  However, the debtor has evidenced a pattern of conduct of doing as little as possible to ensure the accuracy and disclosure of information required to be included in the bankruptcy schedules and statements until compelled to take an action.  The UST has met his burden of showing that the debtor is not entitled to a discharge under § 727(a)(4)(A).

NOW THEREFORE IT IS ORDERED THAT the debtor's discharge is denied pursuant to §§ 727(a)(2)(A, B) and 727(a)(4)(A).

AND IT IS SO ORDERED.

---

[79]  The Court makes no findings regarding the adequacy of the representation of counsel in this case because it is not determinative of the conclusions reached herein.

23